### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Fredericka Wagner, *et al.*,

      Plaintiffs,

v.

                             **Case No. 2:08-CV-00431**
                             **JUDGE SMITH**
                             **Magistrate Judge Kemp**

Circle W. Mastiffs, *et al.*,

      Defendants.

Craig W. Williamson,

      Plaintiff,

v.

                             **Case No. 2:09-CV-00172**
                             **JUDGE SMITH**
                             **Magistrate Judge Kemp**

American Mastiff Breeders
Council, *et al.*,

      Defendants.

### <u>OPINION AND ORDER</u>

These two consolidated cases involve the sale of American Mastiff puppies. This matter is

currently before the Court on the Motion to Dismiss of Defendants American Mastiff Breeders

Council ("AMBC"), Bill and Sandy Berger d/b/a American Mastiff, Flying W Farms, Connie

Hammond d/b/a Sycamore Creek Kennels, Cameran Pridmore d/b/a Capell Creek Ranch and

Kennels, Diane St. Martin d/b/a Hidden Acres Farm, Kerry Mikalchus d/b/a Lazy M American

Mastiffs, Jim and Sandy Taylor d/b/a Deepwood Acres American Mastiffs, Tammy Venkler d/b/a

Mystic American Mastiffs, Fredericka Wagner, Kevin and Melanie Ware d/b/a Orion Farms, and

Candace Ware (collectively "Defendants") (Doc. 40).[1]  The sole Plaintiff, Craig Williamson, has

filed a response in opposition to the motion, and Defendants have filed a reply.  Thus, this motion

has been fully briefed by the parties and is ripe for disposition.  For the reasons that follow, the

Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.

I.      **Background**

        Plaintiff Williamson alleges the following.  The American Mastiff is a recognized canine

breed and is registered with the Continental Kennel Club.  (First Am. Compl. ¶ 1).  The American

Mastiff breed was created by Defendants Fredericka Wagner and Flying W Farms, and these

Defendants have indicated that the American Mastiff breed was created from seven-eighths Old

English Mastiff and one-eighth Anatolian Mastiff.  *Id.* at ¶ 2.  The AMBC is an organized

association of American Mastiff breeders who agreed to abide by the guidelines and rules of the

AMBC.  *Id.* at ¶ 3.  The individual Defendants are breeders of the American Mastiffs and

members of the AMBC.  *Id.* at ¶ 4.  Defendants advertise and sell American Mastiff companion

puppies and breeder puppies in interstate commerce for profit.  *Id.* at ¶ 5.  Defendants and

Plaintiff Williamson, who owns Circle W Mastiffs, a sole proprietorship, are the only known

breeders and sellers of American Mastiffs in the United States.  *Id.* at ¶¶ 6, 9, and 10.  The

relevant product market for the antitrust violations is the market for "American Mastiffs, both for

companion dogs and for breeder dogs."  *Id.* at ¶ 7.  The relevant geographic market for the

_____

        [1] The document numbers referenced in this Opinion are the document numbers assigned in
case No. 2:09-cv-172.

2

alleged antitrust violations is the United States.  *Id.* at ¶ 8.  "Owners and breeders of American

Mastiffs are proud and partial to the American Mastiff breed, believing the American Mastiff is

superior to other canine breeds such that other canine breeds are not a substitute market or

competing market for the American Mastiff."  *Id.* at ¶ 8.  Plaintiff Williamson's membership in the

AMBC was listed as Circle W.  *Id.* at ¶ 10.

     In January 2005, Defendant Fredericka Wagner sent an email to all of the AMBC breeders

prohibiting the breeders from selling "breeder quality" American Mastiffs to non-AMBC approved

breeders.  *Id.* at ¶ 12.  In October 2005, Defendant Cameron Pridmore told Plaintiff by email that

there was an agreement among the AMBC Breeders to sell each puppy for $1,200.  *Id.* at ¶ 13.

In February 2006, Defendant Pridmore sent an email to potential purchasers of American Mastiff

puppies stating:  "DON'T purchase from the Nevada breeders!  They are currently being excused

from the AMBC for breach of contract."  *Id.* at ¶ 14.  In March 2006, Defendant Fredericka

Wagner informed Plaintiff Williamson by email that all AMBC breeders are "well aware of the

ceiling on prices; You can charge less, but not more."  *Id.* at ¶ 15.  In August 2006, Defendant

Kevin Ware sent an email to all AMBC breeders requesting a vote on whether to raise the ceiling

price to $1500 from $1200, and also stated that the Williamsons could participate only if they

agreed to the ceiling price.  *Id.* at ¶ 16.  The next day, Defendant Fredericka Wagner asked

Jennifer Williamson to agree to fix the prices with the other breeders at $1500.  *Id.* at ¶ 17.  When

the Williamsons refused to follow the "price-fixing collusion," the AMBC Executive Committee,

in March 2006, instructed its breeders not to provide any customer references to Circle W, enable

Circle W to acquire American Mastiff puppies or breeding stock, or make any reference to Circle

W in forums, newsgroups or any public media.  *Id.* at ¶ 18.  This "boycott" was implemented by

Defendants. *Id.* at ¶ 19. By the emails described above, and other documents, the AMBC Breeders made agreements to set an artificial "ceiling price" for American Mastiff puppies. *Id.* at ¶ 20. Plaintiff Williamson had customers who were willing to pay more than the ceiling price for the puppies. *Id.* "This action by the AMBC breeders has harmed Williamson because he has not been able to charge what the market would bear for his puppies." *Id.* The boycott implemented by Defendants has prevented Plaintiff from growing his business and ultimately will force him out of the business of breeding American Mastiffs because he cannot replace his breeding stock. *Id.* at ¶¶ 21, 23, and 24.

Defendants have conspired to prevent new breeders from entering the American Mastiff market. *Id.* at ¶ 22. Emails and other documents demonstrate a collective boycott agreement against individuals expressing interest in breeding American Mastiffs. *Id.* To this end, at a 2007 AMBC meeting, Defendants agreed to not permit any new American Mastiff breeders to enter the market for a 5-year period. *Id.* And Defendants require each puppy purchaser to agree that the puppy would be spayed or neutered. *Id.* These actions of Defendants harm competition for the sale of American Mastiffs. *Id.* at ¶ 24.

Defendant Cameron Pridmore, an AMBC breeder, has repeatedly made false written statements to Circle W's customers, potential customers, and other individuals, regarding Circle W's dogs and Circle W's standing within the AMBC. *Id.* at ¶ 25. On January 6, 2008, Defendant Pridmore published the following false statements on an American Mastiff "chat room," located at the Internet address of www.americanmastiff.org/AMForums:

a. a maskless dog is not an American Mastiff;

b. Circle W misrepresented the dog when it lead [sic] the owner to believe the

dog was an American Mastiff; and

  c.  the owner should report Circle W to the Continental Kennel Club (CKC).

*Id.* at ¶ 25. The statements in subparagraphs a and b were false. *Id.* On October 16, 2007,

Defendant Pridmore published an email to Douglas A. Kent, the moderator of the chat room

noted above, falsely stating that a puppy on Circle W's website is not an American Mastiff but

looks like a yellow Lab. *Id.* at ¶ 26. These statements were made by Defendant Pridmore with

knowledge of and/or with reckless disregard of, the falsity of these statements, and with specific

intent to cause harm to Plaintiff and his business. *Id.* at ¶ 27. These statements damaged

Plaintiff's reputation in the business, general reputation for integrity, and caused Plaintiff financial

harm. *Id.* at ¶ 28.

  In April 2008, Plaintiff, through his attorney, wrote to Defendant Wagner and requested

that the other members of the AMBC cease the practices of setting price ceilings for puppies,

making collective boycott agreements against Circle W and other potential breeders, and making

agreements to limit the number of American Mastiff breeders allowed in the marketplace. *Id.* at ¶

29. Shortly thereafter, Defendants filed a lawsuit against Plaintiff Williamson in this Court,

alleging that Plaintiff was falsely claiming that its dogs for sale were American Mastiffs. *Id.* at ¶¶

29 and 30. Three of the four dogs Circle W breeds were purchased directly from Defendant

Wagner, who had represented to Plaintiff Williamson that the dogs were purebred American

Mastiffs. *Id.* at ¶ 29. The fourth dog was an offspring of two dogs purchased from Defendant

Wagner that had been presented to Plaintiff as purebred American Mastiffs. *Id.* The lawsuit was

intended to dissuade Plaintiff Williamson from taking any action against Defendants and their

anticompetitive business practices. *Id.* at ¶ 32. The lawsuit was filed to "drive Williamson out of

the business of selling American Mastiffs, and reduce competition with the AMBC Breeders and interfere with Circle W's business relationships." *Id.*

The lawsuit referred to by Plaintiff Williamson's First Amended Complaint involves a Lanham Act claim against Jennifer and Craig Williamson and Circle W Mastiffs (collectively "Circle W"), whereby Defendants allege that Circle W bred, advertised, and sold dogs it claimed were purebred American Mastiffs, but were not, thereby diluting the American Mastiff Brand (hereinafter this lawsuit will be referred to as the "Lanham Act Action"). The Lanham Act Action was assigned case No. 2:08-cv-431. A little more than one month later, Plaintiff Williamson initiated an action against Defendants, in the United States District Court for the District of Nevada, asserting antitrust and various other claims arising from Defendants' conduct in connection with the sale of American Mastiff puppies (the "Antitrust Action"). Upon motion, the Antitrust Action was transferred to this Court and is now case No. 2:09-cv-172 (S.D. Ohio). After the Antitrust Action was transferred to this Court, the Court granted a motion to consolidate the case with the Lanham Action (Doc. 9).

In April 2009, Defendants filed a motion for judgment on the pleadings in the Antitrust Action. Plaintiff Williamson filed a response in opposition to the motion and a motion to amend the complaint. In August 2009, this Court granted Plaintiff Williamson's motion for leave to file an amended complaint, and denied as moot Defendants' motion for judgment on the pleadings (Doc. 37). Plaintiff's First Amended Complaint (or, "the amended complaint") was accordingly filed by the Clerk of this Court (Doc. 38).

By his First Amended Complaint, Plaintiff Williamson asserts antitrust and various other claims arising from Defendants' alleged price fixing in connection with the sale of American

6

Mastiff puppies. According to Plaintiff Williamson, his refusal to participate in the price fixing scheme has resulted in his exclusion from the AMBC and his inability to purchase new breeding stock. More particularly, Plaintiff Williamson asserts claims under § 1 of the Sherman Act (Counts One, Three, Four, and Five), § 2 of the Sherman Act (Count Two), defamation and libel/slander per se (Counts Six and Seven), fraud (Count Eight), intentional interference with a business relationship (Count Nine), conspiracy as to Counts One through Nine (Count Ten), and seeks a declaration that Defendants violated the Sherman Act (Count Eleven).

The Antitrust Action Defendants, which include the AMBC and its member breeders, have moved to dismiss the First Amended Complaint on grounds that Plaintiff Williamson has failed to plead facts sufficient to support his claims. This motion is now before the Court for disposition.

## II.    Rule 12(b)(6) Standard

A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief [.]" A court, in considering a 12(b)(6) motion to dismiss, must "construe the complaint in the light most favorable to the plaintiff," accepting as true all the plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

To survive dismissal pursuant to Rule 12(b)(6), however, a claim must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The United States Supreme Court, in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), clarified *Twombly's* plausibility standard:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Id.*, at 1949-50. While a complaint need not contain "detailed factual allegations," its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, at 555. It is with these principles in mind that the Court addresses Defendants' motion to dismiss.

## III.   Discussion

Defendants seek the dismissal of Plaintiff Williamson's antitrust claims (Counts One through Five) and his other claims (Counts Six through Eleven), arguing that Plaintiff has failed to state a claim upon which relief can be granted as to each of these claims. The Court first will address Plaintiff's antitrust claims collectively and then will address each remaining claim in turn.

### A.     Antitrust Claims (Counts One through Five)

Plaintiff Williamson's First Amended Complaint asserts claims under § 1 of the Sherman Act (Counts One, Three, Four, and Five) and § 2 of the Sherman Act (Count Two). Generally,

Plaintiff alleges that Defendants engaged in unlawful anticompetitive activities by price-fixing, participating in a group boycott, and initiating a frivolous lawsuit against Plaintiff. Defendants contend that all of Plaintiff's antitrust claims under sections 1 and 2 of the Sherman Act fail to satisfy the requirements necessary to survive a motion to dismiss. In particular, Defendants argue that Plaintiff fails to allege any factual basis to support the claim that he has suffered antitrust injury, and therefore fails to allege antitrust standing. Defendants also argue that Plaintiff has failed to show that his claims against Defendants deserve *per se* scrutiny, and not rule of reason analysis, and that Plaintiff has not pled facts to state the essential elements of a rule of reason claim. Specifically as to the § 2 Sherman Act claim, Defendants argue that this claim fails because Plaintiff does not allege facts to support the essential elements of a monopolization claim.

Section 1 of the Sherman Act provides in pertinent part as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. And Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]" 15 U.S.C. § 2. Thus, "[w]hile § 1 of the Sherman Act forbids contracts or conspiracies in restraint of trade or commerce, § 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993).

Although the Sherman Act, by its terms, prohibits every agreement "in restraint of trade," the United States Supreme Court has long recognized that Congress intended to outlaw only "unreasonable restraints." *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The two major

9

types of antitrust conspiracies to restrain trade are horizontal and vertical. *Care Heating &
Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1013 (6th Cir. 2005). "Horizontal
conspiracies involve agreements among competitors at the same level of market structure to stifle
trade, such as agreements among manufacturers or among distributors to fix prices for a given
product[.]" *Id.* "Vertical conspiracies, on the other hand, involve agreements among actors at
different levels of market structure to restrain trade, 'such as agreements between a manufacturer
and its distributors to exclude another distributor from a given product and geographic market.' "
*Id.* (quoting *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir.
1988)).

    Furthermore, most antitrust claims are analyzed under a "rule of reason," *id.*, which
"requires the court to analyze the actual effect on competition in a relevant market to determine
whether the conduct unreasonably restrains trade." *Total Benefits Planning Agency, Inc. v.
Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (citing *Nat'l Soc'y of Prof'l
Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). "In other circumstances, the restraints have
such predictable and pernicious anticompetitive effect, and such limited potential for
procompetitive benefit, that they are deemed unlawful *per se*." *Khan*, 522 U.S. at 10.

    Before addressing whether Plaintiff's First Amended Complaint sets forth the elements of
a Section 1 or Section 2 Sherman Act claim, the Court must first examine the threshold
requirement of standing. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,
484-89 (1977); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) ("[A]ntitrust standing
is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this
requirement we must dismiss it as a matter of law."); *see also HyPoint Tech., Inc. v.*

*Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991). Standing to bring an action under the

Sherman Act is conferred by Section 4 of the Clayton Act, which provides, in pertinent part, that

"any person who shall be injured in his business or property by reason of anything forbidden in the

antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and

the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

Antitrust standing is narrower than constitutional standing. "Harm to the antitrust plaintiff

is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must

make a further determination whether the plaintiff is a proper party to bring a private antitrust

action." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S.

519, 535 (1983). To establish antitrust standing, an antitrust claimant must prove antitrust injury,

which is to say (1) "injury of the type that the antitrust laws were intended to prevent" and (2)

injury "that flows from that which makes the defendants' acts unlawful." *Brunswick Corp.*, 429

U.S. at 489; see *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986) (noting that

antitrust injury is a "necessary, but not always sufficient," condition of antitrust standing)); *see

also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (noting that the

necessary "antitrust injury" is an injury attributable to the anticompetitive aspect of the practice

under scrutiny).

Therefore, unless an antitrust plaintiff alleges an injury that arises from "an anticompetitive

aspect of the practice under scrutiny," the complaint will not survive Rule 12(b)(6) scrutiny. *CBC

Companies, Inc.*, 561 F.3d at 572. Furthermore, a plaintiff alleging antitrust injury must allege

injury to a relevant market, not just injury to the plaintiff. *Bassett v. Nat'l Collegiate Athletic

Ass'n*, 528 F.3d 426, 434 (6th Cir. 2008). That is, an antitrust plaintiff must demonstrate that

"the alleged violation tended to reduce competition overall" and that "the plaintiff's injury was a consequence of the resulting diminished competition." *CBC Companies, Inc.*, 561 F.3d at 572 (quoting *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 887 (6th Cir. 2007)). This heightened standing requirement reflects the principle that antitrust laws exist to protect competition, not individual competitors. *Brunswick Corp.*, 429 U.S. at 488 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Consequently, "[i]f the injury is not of the requisite type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it." *Barton & Pittinos v. Smithkline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997). Moreover, in view of the federal pleading requirements outlined above, a "naked assertion" of antitrust injury is not enough; an antitrust claimant must put forth factual "allegations plausibly suggesting (not merely consistent with)" antitrust injury. *NicSand, Inc.*, 507 F.3d at 451 (quoting *Bell Atl.*, 127 S.Ct. at 1966).

Plaintiff Williamson argues that he has sufficiently alleged antitrust injury. Plaintiff's First Amended Complaint alleges that Defendants' price-fixing conduct has prevented him from selling American Mastiff puppies at a price higher than the ceiling price agreed upon by Defendants. Additionally, Plaintiff alleges that Defendants' boycott against him has prevented him from obtaining new American Mastiff breeding stock and selling breeding stock to potential new breeders, both of which will ultimately eliminate his ability to breed and sell American Mastiffs.

The Court will first address Plaintiff's allegation that Defendants agreed to fix a maximum price for American Mastiff puppies. The Supreme Court of the United States has observed that

12

"[t]here is no doubt that horizontal intrabrand price fixing is *per se* illegal, even if the conspirators lack the market power to affect interbrand competition in a manner that would violate the rule of reason." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 745 n.7 (1988). Here, the amended complaint alleges that Plaintiff and Defendants are all competitors with each other in the market of selling American Mastiff puppies throughout the United States, and that Defendants agreed to fix the maximum price for the sale of an American Mastiff puppy at $1,500. But proof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently. *Atlantic Richfield*, 495 U.S. at 344. Thus, even assuming Defendants' agreement to set a ceiling price for an American Mastiff puppy was a *per se* violation of antitrust law, Plaintiff Williamson must independently show antitrust injury. *See id.* at 341-42 ("The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act.").

In *Atlantic Richfield*, 495 U.S. at 337, the United States Supreme Court held that "[w]hen a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation." The Court explained: "A firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it is unable to raise prices. . . . This is not *antitrust injury*; indeed, cutting prices in order to increase business often is the very essence of competition. . . .The antitrust laws were enacted for the protection of *competition*, not *competitors*." *Id.* at 337-38 (quotations and citations omitted; emphasis in original). Although *Atlantic Richfield* involved "vertical" price-fixing agreements,

13

and Plaintiff alleges "horizontal" price-fixing, the Court views the reasoning expressed therein to be instructive here. As an alleged competitor of Defendants, Plaintiff asserts injury due to his inability to charge more for American Mastiff puppies. But a competitor's inability to charge more (provided the price is at a nonpredatory level)[2] is not an injury protected under antitrust laws. Thus, Plaintiff's alleged inability to raise his prices for American Mastiff puppies on account of the price agreement between the other breeders, who are his alleged competitors, is not the type of injury protected under antitrust laws.

As to the alleged group boycott, the Court is not entirely convinced by Defendants' arguments that Plaintiff's allegations concerning a group boycott do not allege an antitrust injury. However, it is unnecessary to address and resolve this issue. Insofar as Plaintiff alleges antitrust injury due to the boycott organized by Defendants against him and others, his antitrust claims suffer from a fatal deficiency – Plaintiff fails to adequately allege a relevant market.[3] Plaintiff Williamson alleges that the relevant product market for the alleged antitrust violations is the

---

[2] There has been no suggestion in this matter of predatory pricing. Plaintiff simply alleges that the pricing was "unreasonably low" because he could have charged more.

[3] Although the terms "relevant market" and "antitrust injury" are separate concepts, and are thus typically analyzed independently, *see, e.g., Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 963-64 (6th Cir. 2004), the Court notes that they are "intertwined" in application. *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y.) (noting that the "requirement of pleading a relevant market is closely intertwined with the element of antitrust injury" as "[a] complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed.") (Citation omitted). Furthermore, Plaintiff has not alleged a group boycott that would require a *per se* approach. In limited circumstances, a group boycott can constitute a *per se* violation. *See FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986) ("the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor"). But this approach is not appropriate here because the exercise of "market power" by Defendants' cannot be inferred from the facts alleged.

market for American Mastiffs, both for companion dogs and for breeder dogs.  According to

Plaintiff, the actions of Defendants have the effect of unlawfully excluding him from the American

Mastiff market, and that this boycott injures competition in the relevant market.

An antitrust plaintiff must define "the relevant market within which the alleged

anticompetitive effects of the defendant's actions occur."  *See Worldwide Basketball & Sport*

*Tours, Inc.*, 388 F.3d at 962 ("Failure to identify a relevant market is a proper ground for

dismissing a Sherman Act claim.").  The relevant market consists of two components:  product or

service market and geographic market.  *Brown Shoe Co., Inc.*, 370 U.S. at 324.  To ascertain the

former, the "reasonable interchangeability" standard is applied.  *White & White, Inc. v. Am. Hosp.*

*Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983).  "Reasonable interchangeability" is assessed by

considering (1) product uses (whether substitute products can perform the same function) and/or

(2) consumer response (also known as "cross-elasticity"), defined as "consumer sensitivity to

price levels at which they elect substitutes for the defendant's product or service."  *Ky. Speedway,*

*LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009) (quoting

*Worldwide Basketball & Sport Tours, Inc.*, 388 F.3d at 961).  Although market definition is a

highly fact-based inquiry, an "insufficiently pled or totally unsupportable proposed market" will

necessitate a dismissal.  *See Michigan Division-Monument Builders of North America v.*

*Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008).

Plaintiff's amended complaint makes the conclusory statement that the alleged relevant

market is the market for American Mastiff puppies.  Apparently in an attempt to show why the

market should be limited to this dog breed, the amended complaint alleges that "[o]wners and

breeders of American Mastiffs are proud and partial to the American Mastiff breed, believing the

American Mastiff is superior to other canine breeds such that other canine breeds are not a substitute market or competing market for the American Mastiff." (First Am. Compl. ¶ 8).

It is common knowledge that there are many different breeds of companion dogs, and that each breed of dog exhibits characteristics, or at least combinations of characteristics, unique to the breed, such as size, coat color and texture, and disposition. Additionally, dog owners, like owners of other commodities who have personal preferences as to certain brands of a particular product,[4] have their own personal preferences as to which breed or mix of breeds they prefer. Thus, Plaintiff's allegation that American Mastiff owners and breeders are partial to this breed because they view it as "superior to other canine breeds," simply reflects a preference for the breed based on the subjective view that the particular characteristics of the breed are most desirable for a dog owner. But this allegation does not suggest why other breeds of companion dogs could not be reasonably interchangeable alternatives. Plaintiff does not allege facts suggesting that other breeds of dogs cannot perform the same function as the American Mastiff breed, or that there is insufficient cross-elasticity between the American Mastiff breed and reasonable substitutes for it. Therefore, the Court concludes that Plaintiff's allegation of a competition-reducing effect on the relevant market, due to the boycott, is deficient because the relevant market asserted by him does not rise to the level of plausibility required by the federal pleading requirements.

As to Plaintiff's claim that Defendants have filed a frivolous Lanham Act lawsuit against

_____

[4] In response to Defendants' motion to dismiss, Plaintiff asserts that dogs are not commodities, and therefore antitrust claims relating to them should not be analyzed as such. Plaintiff's position is unsupportable, as dogs are regarded as the property of its owner under Ohio law. *See, e.g., Strawser v. Wright*, 610 N.E.2d 610 (Ohio Ct. App. 1992) (citing *Hill v. Micham*, 157 N.E. 13 (Ohio 1927)).

him in violation of § 1 of the Sherman Act, Plaintiff faces an insurmountable bar to relief because the Court has already determined that Defendants have stated a claim under the Lanham Act sufficient to withstand Plaintiff's Rule 12(b)(6) motion. (*See* March 25, 2009 Opinion and Order in case No. 2:08-cv-431). Thus, Defendants' Lanham Act lawsuit against Plaintiff is not, as a matter of law, a sham lawsuit that would not be entitled to First Amendment immunity under the "*Noerr-Pennington* doctrine." *See Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992).

Although dismissal of Plaintiff's antitrust claims may be warranted on other grounds raised by Defendants, the Court limits its analysis to the grounds discussed above because they are straightforward and dispositive. Accordingly, as to all of Plaintiff's antitrust claims, Defendants' motion to dismiss is **GRANTED**.

### B.    Defamation and Libel/Slander *per se* Claims (Counts Six and Seven)

By Counts Six and Seven of Plaintiff Williamson's complaint, he alleges defamation *per quod* and defamation *per se*. Defendants argue that Plaintiff has failed to plead facts that plausibly suggest a viable defamation claim. More particularly, Defendants argue that Plaintiff fails to plead that the publication of the statements alleged was appreciated by anyone, and that Plaintiff pleads conclusions about the state of mind of Defendant Pridmore, without any facts supporting the conclusions.

Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused

17

by the publication." *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 1992)) (internal quotation marks omitted).

Actionable defamation falls into one of two categories: defamation *per se* or defamation *per quod*. In order to be actionable *per se*, the allegedly defamatory statement must fit within one of four classes: (1) the words import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the words impute some offensive or contagious disease calculated to deprive a person of society; (3) the words tend to injure a person in his trade or occupation; and (4) the words tend to subject a person to public hatred, ridicule, or contempt. *Am. Chem. Soc. v. Leadscope*, 2010 WL 2396544, *12 (Ohio Ct. App. June 15, 2010) (*citing Schoedler v. Motometer Gauge & Equip. Corp.*, 15 N.E.2d 958 (Ohio 1938) and *Bigelow v. Brumley*, 37 N.E.2d 584 (Ohio 1941)). Defamation *per se* occurs if a statement, on its face, is defamatory. *Moore v. P.W. Publishing Co.*, 209 N.E.2d 412, 415 (Ohio 1965); *Becker v. Toulmin*, 138 N.E.2d 391, 397 (Ohio 1956). Conversely, a statement is defamatory *per quod* if it can reasonably have two meanings, one innocent and one defamatory. *Moore*, 209 N.E.2d at 415; *Becker*, 138 N.E.2d at 397. Therefore, when the words of a statement are not themselves, or *per se*, defamatory, but they are susceptible to a defamatory meaning, then they are defamatory *per quod*. *Moore*, 209 N.E.2d at 415; *Becker*, 138 N.E.2d at 395.

When a statement is defamatory *per se*, a plaintiff "may maintain an action for [defamation] and recover damages, without pleading or proving special damages." *Becker*, 138 N.E.2d at 395. That is, in cases of defamation *per se*, the law presumes the existence of damages. *Wampler v. Higgins*, 752 N.E.2d 962, 977 n.8 (Ohio 2001). But when a statement is only

18

defamatory *per quod*, a plaintiff must plead and prove special damages.  *Becker*, 138 N.E.2d at 397.

Contrary to Defendants' arguments, Plaintiff Williamson's First Amended Complaint states a plausible claim for defamation, as it alleges facts that, if true, would establish the necessary elements of a defamation claim.  Plaintiff Williamson's amended complaint alleges that Defendant Pridmore made false written statements that were published to Circle W's customers and potential customers regarding Circle W's dogs and Circle W's standing within the AMBC.  More particularly, the amended complaint alleges that in January 2008, Defendant Pridmore published, on an American Mastiff "chat room" (located at www.americanmastiff.org/AMForums), false statements regarding a dog known by readers to be a dog bred by Plaintiff, including a statement that Circle W misled a new owner into believing that the dog was an American Mastiff.

Defendants argue that these alleged statements are not legally defamatory because they are true.  Defendants reason that Defendant Pridmore's statement that Circle W misrepresented a dog as an American Mastiff is true because Defendant Pridmore also stated that a maskless dog is not an American Mastiff, which is allegedly confirmed by the Continental Kennel Club's Internet website.  Although technically the amended complaint alleges that the generic statement that a maskless dog is not an American Mastiff was false, in context, the amended complaint could be viewed as challenging the implicit assertion put forth by the statement – that the dog bred by Circle W was maskless and therefore was not an American Mastiff, as represented by Circle W to the new owner.  Alternatively, the allegation that Defendant Pridmore falsely stated that Plaintiff misrepresented the dog could be viewed independently of the other statement.  Thus, even

19

assuming Defendant Pridmore's statement that a maskless dog is not an American Mastiff is uncontestably true, that does not necessarily confirm the truthfulness of his additional statement that Circle W misrepresented the dog as an American Mastiff.

The amended complaint alleges that Defendant Pridmore made his statements with knowledge of the falsity of the statements and with specific intent to cause harm to Plaintiff Williamson and his business. Although unnecessary for a defamation *per se* claim, the amended complaint alleges special damages. The amended complaint alleges that the statements damaged Plaintiff Williamson's reputation in the business and his general reputation for integrity, and caused him financial harm due to loss of sales. In sum, the amended complaint alleges that Defendant Pridmore made a false statement that adversely affected Plaintiff and his business and that Defendant Pridmore made the statement knowing it to be false.

In view of these allegations, the Court finds that Plaintiff Williamson's amended complaint adequately alleges the elements of a defamation cause of action, and Defendants' motion to dismiss Plaintiff's defamation claims is **DENIED**.

### C.    Fraud Claim (Count Eight)

Count Eight of Plaintiff Williamson's complaint alleges that Defendants Wagner and Flying W Farms defrauded him into purchasing puppies that were not purebred American Mastiffs. As to this claim, Defendants argue that Plaintiff's pleadings fall short of the particularity requirement set forth in Federal Rule of Civil Procedure 9(b). The Court agrees with Defendants.

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Thus, a complaint

alleging fraud must state the specific circumstances surrounding the alleged fraud with particularity. *See* Fed. R. Civ. P. 9(b); *Power & Tel. Supply Co. v. Sun Trust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (recognizing that plaintiffs asserting a fraud claim must "at a minimum, allege the time, place, and content of the alleged misrepresentations on which he or she justifiably relied, the fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud."). The main purpose of Rule 9(b)'s heightened pleading requirements is to provide defendants with "notice of the specific conduct with which they were charged," so that the defendants can prepare responsive pleadings. *See United States ex rel. Bledsoe v. Comty. Health Sys. (Bledsoe II)*, 501 F.3d 493, 510 (6th Cir. 2007).

In addition to alleging fraud in the Antitrust Action, Plaintiff Williamson alleged fraud as a counterclaim in the Lanham Act Action. And whether Plaintiff's fraud claim in the Lanham Act Action was sufficiently pled under Rule 9(b) has been resolved by this Court. In April 2009, Defendants Wagner and Flying W Farms moved to dismiss, pursuant to Rule 12(b)(6), Plaintiff Williamson's counterclaims in the Lanham Act Action, including his counterclaim alleging fraud (Doc 17). In moving for dismissal, these defendants argued that the fraud claim was not pled with the required particularity. By Opinion and Order, filed March 12, 2010, this Court denied the motion to dismiss as it related to the fraud claim (Doc. 53). The Court found that Plaintiff adequately alleged the elements to establish a fraud claim and stated with particularity the specific circumstances surrounding the alleged fraud as required by Rule 9(b). Generally, Plaintiff Williamson's counterclaim in the Lanham Act Action alleges that Defendants Wagner and Flying W Farms misrepresented that the dogs they were selling to Plaintiff Williamson were "purebred American Mastiffs to breed standard, and capable of creating purebred offspring to breed

standard." (Countercl. ¶ 20). Furthermore, the specific allegations included, inter alia, the place and dates Plaintiff was induced to purchase the dogs, and even included the names of the dogs it was induced to purchase. (Countercl. ¶¶ 2-6).

As in the Lanham Act Action, Plaintiff Williamson's First Amended Complaint in the Antitrust Action generally alleges that Defendants Wagner and Flying W Farms misrepresented that the dogs they were selling to Plaintiff Williamson were purebred American Mastiffs to breed standard, and capable of creating purebred offspring to breed standard. (*See* Countercl. ¶ 20; First Am. Compl. ¶ 90). Unlike the fraud counterclaim alleged in the Lanham Act Action, however, Plaintiff Williamson's fraud claim alleged in the Antitrust Action does not state with particularity the specific circumstances surrounding the alleged fraud. As noted above, allegations in the Lanham Act Action included the place and dates it was induced to purchase the dogs. The pleadings in the Antitrust Action, however, do not allege the date or place of the alleged misrepresentation. Therefore, the amended complaint in the Antitrust Action does not provide the particularity required under Rule 9(b). *See Power & Tel. Supply Co., supra*; *Kashat v. Paramount Bancorp., Inc.*, Case No. 09-10863, 2010 WL 538295 (E.D. Mich. Feb. 10, 2010); *First Global Communications, Inc. v. Bond*, Case No. C05-749P, 2006 WL 231634 (W.D. Wash. Jan. 27, 2006).

Because Plaintiff has not sufficiently alleged a fraud claim in the Antitrust Action, Defendants' motion to dismiss this claim is **GRANTED**.[5]

---

[5] To the extent Plaintiff was seeking to assert a fraud claim in the Antitrust Action based on the same conduct alleged in the Lanham Act Action, the Court notes that, because the fraud claim in the Lanham Act Action remains pending, Plaintiff may continue to seek damages for the alleged conduct notwithstanding the dismissal of the fraud claim in the Antitrust Action.

**D.      Intentional Interference with a Business Relationship Claim (Count Nine)**

Under Ohio law, the elements of tortious interference with a business relationship are (1) a

business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference

causing a breach or termination of the relationship; and (4) damages resulting therefrom.

*Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 774 N.E.2d 775, 780

(Ohio Ct. App. 2002).  Thus, the tort of interference with a business relationship generally occurs

"when a person, without a privilege to do so, induces or otherwise purposely causes a third

person not to enter into or continue a business relation with another[.]"  *A & B-Abell Elevator*

*Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (1995).

Plaintiff's allegations concerning his tortious interference with a business relationship

claim raise a right to relief above the speculative level based on the assumption that all allegations

in the complaint are true.  *See Twombly*.  As to this claim, Plaintiff has alleged each of the four

elements required to establish a claim for tortious interference with a business relationship under

Ohio law.  The amended complaint alleges that Defendants engaged in certain actions, such as

making defamatory statements, with the intent to interfere with Plaintiff's business relationship

with "his customers and prospective customers."  (First Am. Comp. ¶ 99).  In regard to this

allegation, Defendants suggest that Plaintiff was required to name the customers in the amended

complaint to meet the pleading requirements.  But such specificity is not required at the pleadings

stage.  *See, e.g., R & L Carriers, Inc. v. YRC Logistics, Inc.*, Case No. 1:09-cv-383, 2009 WL

3418653 (S.D. Ohio Oct. 19, 2009).  By referring to "customers and prospective customers," the

amended complaint implies that he had existing relationships with customers and was actively

seeking new customers to whom to sell American Mastiff puppies.  While the reference to

23

potential customers may be insufficient to allege a business relationship, Plaintiff's allegation of existing customers satisfies this requirement. And even though the amended complaint does not allege Defendants' knowledge of the identity of specific customers of Plaintiff, it does allege Defendants' knowledge of the customer relationships and Defendants' intent to interfere with and damage these relationships. Additionally, it could be reasonably inferred from the allegations of the amended complaint that Plaintiff's business relationships with existing customers were in fact severed as a result of alleged improper conduct, and that he therefore suffered financially as a result of the conduct.

Because Plaintiff has sufficiently alleged facts to state a claim for tortious interference with a business relationship, the Court **DENIES** Defendants' motion to dismiss this claim.

### E. Conspiracy Claim (Count Ten)

Defendants summarily assert that Plaintiff's common law claim of civil conspiracy should be dismissed for the same reasons the underlying claims fail. Although the Court agrees that Plaintiff's complaint fails to state a claim against Defendants for civil conspiracy, some discussion is appropriate.

The elements of a civil conspiracy claim under Ohio law are: (1) a malicious combination of two or more persons, (2) resulting in injury to person or property, and (3) an unlawful act independent from the actual conspiracy. *Berardi's Fresh Roast, Inc. v. PMD Enterprises*, 2009 WL 4448504, *7 (Ohio Ct. App. 2008). "[C]onspiracy cannot be made the subject of a civil action unless something is done which, in the absence of the conspiracy allegation, would give rise to a cause of action." *Katz v. Banning*, 617 N.E.2d 729, 735 (Ohio Ct. App. 1992).

In support of his common law conspiracy claim, Plaintiff Williamson's complaint alleges

24

that Defendants acted in concert in fixing a maximum price, sanctioning and excluding Plaintiff, making defamatory statements against Plaintiff, and asserting a frivolous claim against Plaintiff in an attempt to (1) injure him, (2) eliminate competition, and (3) monopolize the American Mastiff market. Plaintiff additionally alleges that he suffered damages as a result of Defendants' civil conspiracy. These factual allegations, even if true, do not present a common law conspiracy claim under Ohio law.

While Plaintiff has alleged facts in support of his defamation claims, he has not alleged a "malicious combination" of two or more persons in regard to the alleged defamatory statements. Additionally, Plaintiff's allegations that Defendants took action to exclude him from the circle of American Mastiff breeders, and that Defendants agreed upon a ceiling price for the sale of American Mastiff puppies, fail to present an underlying unlawful act by Defendants. Plaintiff fails to show that Defendants' boycott of him was a violation of the Sherman Act because he has not alleged anticompetitive effects in a relevant market. And while the horizontal maximum price fixing agreement between the breeders may be *per se* unlawful (if they are competitors), Plaintiff suffered no antitrust injury as a result of this agreement, and it is the agreement itself that forms the basis of the alleged illegality. That is, the alleged unlawful act is not independent from the alleged conspiracy. Lastly, contrary to Plaintiff's assertion, Defendants' lawsuit against Plaintiff is not frivolous as a matter of law. (*See* March 25, 2009 Opinion and Order in case No. 2:08-cv-431).

Therefore, Plaintiff has failed to state a claim against Defendants for civil conspiracy. Accordingly, Count Ten of the amended complaint is **DISMISSED**.

F. **Plaintiff's Request for a Declaratory Judgment (Count Eleven)**

Having resolved that all of Plaintiff's antitrust claims must be dismissed, the Court finds it appropriate to also dismiss Plaintiff's request for declaratory relief, which is premised on Defendants alleged violation of the Sherman Act. Accordingly, Count Eleven of the amended complaint is **DISMISSED**.

### G.     Plaintiff's Request to Amend Complaint

In response to Defendants' motion to dismiss, Plaintiff Williamson challenges the arguments of the motion and alternatively moves to file a second amended complaint if the Court concludes that Plaintiff has inadequately pled his claims. Federal Rule of Civil Procedure 15(a) states that when a party is required to seek leave of court in order to file an amended pleading, "leave shall be freely given when justice so requires." A request under Rule 15(a) is subject to the requirements of Rule 7(b), which states that a motion "shall state with particularity the grounds for seeking the order." *See Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 853 (6th Cir. 2006). Thus, a "bare request" for leave to amend is not a proper motion under Rule 15(a). *Id.; see Nation v. United States*, 512 F. Supp. 121, 124-25 (S.D. Ohio 1981) ("Although the Civil Rules do not expressly deal with the manner of presentation of amendments to pleadings, there is substantial authority for the proposition that Civil Rules 7(b)(1) and 15(a) impliedly require submission of the proposed amended pleading with the motion to amend.").

In August 2009, the Court granted Plaintiff's motion for leave to amend his Complaint and instructed the Clerk of the Court to file Plaintiff's First Amended Complaint that accompanied his motion. The granting of this motion mooted Defendants' then pending motion for judgment on the pleadings. Defendants then filed their pending Motion to Dismiss. In response to the Motion to Dismiss, Plaintiff again moves for leave to amend the complaint. But Plaintiff has not

submitted a proposed second amended complaint or otherwise advised the Court of the substance of any amendment it would seek to make. Plaintiff simply relies upon his "bare request" for leave to amend. Thus, Plaintiff fails to state the grounds for the motion with particularity. *See Evans*. Accordingly, Plaintiff's alternative request for leave to file a second amended complaint is **DENIED**.

## IV. Disposition

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Doc. 40). Counts One, Two, Three, Four, Five, Eight, Ten, and Eleven of Plaintiff's First Amended Complaint are hereby **DISMISSED**. Counts Six, Seven, and Nine of Plaintiff's First Amended Complaint remain pending. Plaintiff's Motion to Amend is **DENIED** (Doc. 45).

The Clerk shall remove Documents 40 and 45 from the Court's pending motions list.

**IT IS SO ORDERED.**

  *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**